IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
v.                                  )           Case No. 11-00297-01-CR-W-DW
                                    )
MANUEL OTERO-FIGUEROA,              )
                                    )
                Defendant.          )

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Manuel Otero-Figueroa's Motion to

Suppress Evidence (doc #21). For the reasons set forth below, it is recommended that this motion

be granted.

I. INTRODUCTION

On November 16, 2011, a criminal complaint was filed against defendant Manuel Otero-

Figueroa. On December 13, 2011, the grand jury returned a one-count indictment against defendant

Otero-Figueroa. The indictment charges that on November 16, 2011, defendant knowingly

possessed with intent to distribute five hundred grams or more of methamphetamine.

On April 26, 2012, the undersigned conducted an evidentiary hearing on the motion to

suppress. Defendant Otero-Figueroa was represented by Assistant Federal Public Defender Laine

Cardarella. The Government was represented by Assistant United States Attorney Brent Venneman.

The Government called Detectives Brian Ruch and Ronald Hunter of the Kansas City, Missouri

Police Department as witnesses. The defense called no witnesses to testify.

## II.  FACTS

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the

following proposed findings of fact:

1.     On November 16, 2011, at approximately 7:15 a.m., Detectives Brian Ruch and
       Ronald Hunter and Sergeant Doug Niemeier of the Kansas City, Missouri Police
       Department, Interdiction Unit, were on duty at the bus station at 11th and Troost in
       Kansas City, Missouri.  (Tr. at 3-6)  Detective Ruch was standing out on the
       unloading platform in the rear of the bus terminal.  (Tr. at 5)  Detective Ruch first
       observed Mr. Otero-Figueroa as he was exiting an arriving bus which originates out
       of Texas.  (Tr. at 10)  Detective Ruch testified that he pays close attention to this bus
       because officers have "made numerous, numerous large amount seizures of narcotics
       off this bus with other passengers."  (Tr. at 11)  Detective Ruch's attention was
       drawn to Mr. Otero-Figueroa because Otero-Figueroa took a direct path into the bus
       terminal and out the main exit rather than mingle or look for luggage as other
       passengers were doing.  (Tr. at 10-12)  Mr. Otero-Figueroa had one small carry-on
       wheeled suitcase with him.  (Tr. at 11)

2.     Detective Ruch followed Mr. Otero-Figueroa.  (Tr. at 12)  Detective Ruch observed
       Mr. Otero-Figueroa hailing a taxi cab as he exited the terminal.  (Tr. at 12)  Mr.
       Otero-Figueroa just stated, "Taxi," as one was right there.  (Tr. at 12)  Detective
       Ruch approached Mr. Otero-Figueroa, identified himself, showed Otero-Figueroa his
       badge and police photo identification and asked if he could speak with Otero-
       Figueroa.  (Tr. at 13-14)  Detective Ruch is approximately 6'2" tall.  (Tr. at 23)
       Detective Ruch testified that his tone of voice was conversational.  (Tr. at 16)
       Detective Ruch testified that Mr. Otero-Figueroa seemed receptive in that he seemed
       to understand that Detective Ruch was a police officer who wanted to talk to him, but
       further indicated that he did not understand the English language very well.  (Tr. at
       14, 26-27) Detective Ruch felt that he could not have a conversation with Mr. Otero-
       Figueroa in English so he tried to explain that Detective Hunter, who was inside,
       spoke Spanish and if Otero-Figueroa would like to come with him to speak to
       Detective Hunter, Detective Hunter could explain what was going on.  (Tr. at 14, 26)
       Detective Ruch used an open hand gesture that pointed to the door of the bus
       terminal.  (Tr. at 15)  Detective Ruch did not touch Mr. Otero-Figueroa.  (Tr. at 16)
       Detective Ruch testified that it appeared that Mr. Otero-Figueroa understood what
       Ruch was saying in that Otero-Figueroa picked up his luggage and walked back
       inside the bus terminal with Ruch.  (Tr. at 15)  Detective Ruch thanked Mr. Otero-
       Figueroa for following him inside.  (Tr. at 16)  Detective Ruch was armed, but he did
       not display his firearm at any time.  (Tr. at 16)

2

3.     Detective Ruch and Mr. Otero-Figueroa went into the Customer Service office and waited for approximately two minutes while Detective Hunter finished a conversation with another person. (Tr. at 17-19) Detective Hunter testified that he was just completing an interdiction (that included a search of luggage) with another person when Detective Ruch and Mr. Otero-Figueroa entered the office. (Tr. at 35-36) Detective Ruch testified that he had moved when Detective Hunter joined them so as not to block the exit door. (Tr. at 20, 31) Detective Hunter testified that he also was not blocking the exit door. (Tr. at 41) Detective Ruch testified that if Mr. Otero-Figueroa had turned to leave, he would have let him leave. (Tr. at 30)

4.     Detective Ruch explained to Detective Hunter that Mr. Otero-Figueroa did not understand the English language. (Tr. at 19) Detective Hunter testified that while he does not consider himself completely fluent in Spanish, he is conversant in the Spanish language. (Tr. at 34) Detective Hunter first asked Mr. Otero-Figueroa, in Spanish, "Your ticket, please?" (Tr. at 36, 42) Mr. Otero-Figueroa reached into his pocket and produced his ticket. (Tr. at 36) Detective Hunter then asked in Spanish, "Do you have your identification?" (Tr. at 36, 42) Detective Hunter had to ask, in Spanish, a second time, "Do you have your ID?" (Tr. at 36, 42) Mr. Otero-Figueroa then produced a voter registration card. (Tr. at 36-37) The ticket and voter registration card had different names on them. (Tr. at 37) Detective Hunter handed the documents back to Mr. Otero-Figueroa and then explained that he and Detective Ruch were police officers and that they made sure that no one was bringing narcotics, firearms and large amounts of cash into Kansas City. (Tr. at 37, 42) Detective Hunter showed Mr. Otero-Figueroa his police badge and ID. (Tr. at 43) Detective Hunter then asked Mr. Otero-Figueroa, in Spanish, if they could search his bag. (Tr. at 37) Mr. Otero-Figueroa said, "Si." (Tr. at 37) Detective Hunter told Detective Ruch that he had asked for and received Mr. Otero-Figueroa's consent to search the suitcase. (Tr. at 20, 37) Detective Hunter testified that he did not display his weapon to Mr. Otero-Figueroa and that he spoke to him using a normal speaking voice. (Tr. at 40)

5.     Detective Ruch searched the suitcase right in front of Mr. Otero-Figueroa. (Tr. at 20) While Detective Ruch was searching, Detective Hunter asked Mr. Otero-Figueroa, in Spanish, if he had anything. (Tr. at 38) Mr. Otero-Figueroa replied that he did not have anything. (Tr. at 38) Detective Ruch testified that he felt a hard oblong object inside some jeans that crunched in his hand and which he believed to be narcotics, but Ruch just played it off so as not to alarm Mr. Otero-Figueroa. (Tr. at 21) Detective Ruch testified that the officers have had several instances where they have made notifications to suspects and then had to fight them. (Tr. at 21) As Detective Ruch was zipping up the suitcase, he notified Detective Hunter that this is a party that they would need to place under arrest. (Tr. at 21) Mr. Otero-Figueroa was handcuffed and placed under arrest. (Tr. at 38) Prior to placing Mr. Otero-Figueroa under arrest, Detective Hunter testified that he had not physically touched Otero-Figueroa. (Tr. at 40)

3

6.      Detective Ruch testified that approximately five minutes elapsed from the time that he initially walked up to Mr. Otero-Figueroa to the time that he searched the suitcase. (Tr. at 22)  Detective Ruch never told Mr. Otero-Figueroa that he was free to walk away and end the encounter with Ruch. (Tr. at 22)  However, Detective Ruch also had not indicated to Mr. Otero-Figueroa that he was under arrest (until after the search of the suitcase). (Tr. at 22)

7.      Detective Hunter testified that Mr. Otero-Figueroa appeared to understand the questions that were asked of him in Spanish and that he responded appropriately. (Tr. at 39)  At no point did Mr. Otero-Figueroa tell Detective Hunter that he did not understand or that he did not want to answer his questions. (Tr. at 39)  Detective Hunter testified that he never told Mr. Otero-Figueroa that he had the right to refuse to answer any questions. (Tr. at 39-40)  Detective Hunter testified that Mr. Otero-Figueroa appeared to be calm and that he did not appear to be under the influence of alcohol or drugs. (Tr. at 39)  Detective Hunter testified that Mr. Otero-Figueroa appeared to be in his mid-twenties. (Tr. at 39)

## III.  DISCUSSION

Defendant Otero-Figueroa seeks to suppress "all evidence and testimony relating to such evidence obtained as a result of the unlawful seizure of Mr. Otero-Figueroa on November 16, 2011." (Motion to Suppress Evidence (doc #21) at 1)  Defendant argues that his initial detention outside the bus station was unreasonable as a matter of law and that all evidence obtained as a result of that unlawful seizure must be excluded under the exclusionary rule.  (Id. at 2)

The Supreme Court has described three categories of police-citizen encounters.  The first is communication between police and citizens which involves no coercion or restraint of liberty and, therefore, is outside the scope of the Fourth Amendment.  The second is a brief, minimally intrusive seizure or investigative stop which must be supported by a reasonable suspicion of criminal activity. The third is a highly intrusive full-scale arrest which must be supported by probable cause.  The minimally intrusive stop supported by reasonable suspicion and the full-scale arrest supported by probable cause involve Fourth Amendment considerations.  See United States v. Cortez, 449 U.S. 411, 417 (1981); Reid v. Georgia, 448 U.S. 438, 440 (1980); Brown v. Texas, 443 U.S. 47, 50

4

(1979); <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 878 (1975); <u>Terry v. Ohio</u>, 392 U.S. 1, 16-19 (1968); <u>United States v. Campbell</u>, 843 F.2d 1089, 1092-95 (8th Cir. 1988).

Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual in a public place and asking him questions. <u>See</u> <u>United States v. Jones</u>, 990 F.2d 405, 408 (8th Cir.), <u>cert.</u> <u>denied</u>, 510 U.S. 934 (1993); <u>United States v. Campbell</u>, 843 F.2d 1089, 1092 (8th Cir. 1988). No objective justification is required for such an encounter because no constitutional interest is implicated. <u>See</u> <u>United States v. Mendenhall</u>, 446 U.S. 544, 554-55 (1980); <u>United States v. Nunley</u>, 873 F.2d 182, 184 (8th Cir. 1989); <u>Campbell</u>, 843 F.2d at 1092. Likewise, a search of an individual's baggage done with the individual's consent does not automatically escalate the consensual encounter into an investigative stop. <u>See</u> <u>Florida v. Bostick</u>, 501 U.S. 429, 435 (1991); <u>United States v. Robinson</u>, 984 F.2d 911, 914 (8th Cir. 1993). A court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. <u>See</u> <u>Bostick</u>, 501 U.S. at 439; <u>Robinson</u>, 984 F.2d at 913. As long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of an individual should a court conclude that a seizure has occurred. <u>See</u> <u>Bostick</u>, 501 U.S. at 434; <u>Robinson</u>, 984 F.2d at 913-14.

In the present case, the contact between Detective Ruch and defendant Otero-Figueroa quickly escalated from an attempt at a consensual encounter into an investigative <u>Terry</u>-type seizure. Detective Ruch approached Otero-Figueroa just as Otero-Figueroa was hailing a taxi to leave the bus station. (<u>See</u> Fact No. 2, <u>supra</u>) Detective Ruch, who is over six feet tall, showed defendant

Otero-Figueroa his badge and police photo identification and asked if he could speak with Otero-Figueroa. (Id.) Detective Ruch testified that while defendant Otero-Figueroa seemed to understand that Ruch was a police officer who wanted to talk to him, he was unable to communicate with him further because Otero-Figueroa did not understand the English language and Ruch did not speak Spanish. (Id.) Detective Ruch pointed to the door of the bus terminal and defendant Otero-Figueroa walked back inside the terminal with Ruch. (Id.) The Court finds that at this point, defendant Otero-Figueroa had been seized without any reasonable suspicion. Defendant Otero-Figueroa, who by Detective Ruch's own analysis of the situation could not understand the words the officer was saying, could not have understood that Detective Ruch was seeking his permission to speak with him as opposed to requiring his compliance. Instead, defendant Otero-Figueroa was presented with a physically imposing man who showed a badge and identification and then directed Otero-Figueroa back into the bus terminal. The Court finds that a reasonable person, who could not understand the words Detective Ruch had used, would not have felt free to disregard this show of authority by the police and go about his business.

Detective Ruch then directed defendant Otero-Figueroa out of the public area of the bus terminal and into an office. (See Fact No. 3, supra) There, they waited while a second police officer finished searching another person's luggage. (Id.) After the second officer, Detective Hunter, was finished with that interdiction, he was told by Detective Ruch that Mr. Otero-Figueroa did not understand the English language. (See Fact Nos. 3 and 4, supra) At that point, Detective Hunter could have started over with defendant Otero-Figueroa and explained in Spanish that the officers were seeking Otero-Figueroa's permission to speak with him. However, that did not happen. Instead, Detective Hunter stated to defendant Otero-Figueroa, in Spanish, "Your ticket, please?"

6

(See Fact No. 4, supra)  Defendant Otero-Figueroa produced his ticket.  (Id.)  Detective Hunter then asked in Spanish, "Do you have your identification?" and then a second time, "Do you have your ID?"  (Id.)  The Court finds that a reasonable person would not have felt free to decline the officer's requests or otherwise terminate the encounter.

Defendant Otero-Figueroa produced a voter registration card that did not match the name on his ticket.  (See Fact No. 4, supra)  However, up to this time, there was no evidence presented that the officers had any reason whatsoever to question that defendant Otero-Figueroa was anything other than an innocent traveler.  This is not a case where a consensual encounter escalated into an investigative stop after reasonable suspicion arose because there was never a consensual encounter, that is a reasonable person would not have felt free to terminate the encounter prior to producing the requested ticket and identification.  Defendant Otero-Figueroa's argument that the initial detention outside the bus station was unreasonable as a matter of law and that all evidence obtained as a result of that unlawful seizure must be excluded under the exclusionary rule must prevail.  See United States v. Beck, 140 F.3d 1129, 1140 (8th Cir. 1998)(because officer's detention of defendant was without reasonable suspicion, evidence of drug trafficking obtained during detention was tainted by unlawfulness of detention and should be suppressed).

The Court further finds that the consent to search given by defendant Otero-Figueroa was not "sufficiently an act of free will to purge the primary taint."  Wong Sun v. United States, 371 U.S. 471, 486 (1963).  The question whether a consent is the product of a free will under Wong Sun depends on the facts of each case.  See Brown v. Illinois, 422 U.S. 590, 603 (1975).  Some factors to be considered include whether the defendant has been advised of his rights, the temporal proximity of the violation and the consent, the presence of intervening circumstances and the

7

purpose and flagrancy of the official misconduct. Id. at 603-04. In this case, immediately upon being seized without reasonable suspicion, defendant Otero-Figueroa was directed into a private office by a police officer where he observed another person's luggage being searched by a second police officer. (See Fact Nos. 2 and 3, supra) Defendant Otero-Figueroa was then instructed to produce his ticket and identification by the second police officer. (See Fact No. 4, supra) At this point, the second officer, Detective Hunter, explained that he and Detective Ruch were police officers and that they made sure that noone was bringing narcotics, firearms and large amounts of cash into Kansas City. (Id.) Detective Hunter pulled out his police badge and ID. (Id.) Detective Hunter then asked defendant Otero-Figueroa if the officers could search his bag. (Id.) The only circumstance which occurred between defendant's initial seizure and Detective Hunter's request to search was an even greater show of authority on the part of the police. No evidence was presented that defendant Otero-Figueroa was told he was free to leave or that he could refuse to consent to a search. The Court finds that defendant's response of "Si," was not an act of free will that purged the improper seizure to which he had been subjected since he had attempted to hail a taxi. Instead, defendant Otero-Figueroa merely acquiesced to the officers' continued show of authority.

IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting defendant Otero-Figueroa's Motion to Suppress Evidence (doc #21).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on

appeal of the factual findings in this Report and Recommendation which are accepted or adopted

by the district judge, except on the grounds of plain error or manifest injustice.


                                          /s/ Sarah W. Hays
                                        SARAH W. HAYS
                                UNITED STATES MAGISTRATE JUDGE